FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION   01 JAN 31 PM 2: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| MICHELE RENEE DANIEL, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CV 99-JEO-0265-S |
| | ) |
| FEDERAL RESERVE BANK OF ATLANTA, | ) |
| | ) |
| Defendant. | ) |

ENTERED

JAN 31 2001

**MEMORANDUM OPINION**

I.   **INTRODUCTION**

Before the court is the defendant's Motion for Summary Judgment.  (Doc. 12).[1]

Michele Renee Daniel (the "plaintiff") filed this action against the Federal Reserve Bank of

Atlanta (Birmingham branch) (the "defendant"), her former employer.  The plaintiff alleges

that she was the victim of disparate treatment and was terminated in violation of Title VII

of the Civil Rights Act of 1991, as amended by the Pregnancy Discrimination Act, 42 U.S.C.

§ 2000e(k) (Doc. 1 at Counts I and IV); she also alleges various state law claims (Doc. 1

at Counts II, III, V and VI).[2]

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court
in the court's record of the case.

[2] In asserting its Motion for Summary Judgment, the defendant alludes to, but does
not discuss, a hostile work environment claim.  (Doc. 21 at 5-6).  The plaintiff does not
specifically articulate such a claim.  (Doc. 1 at ¶¶ 15-20).  Even if the court were willing to
presume such a claim to have been implicitly raised in the complaint, it would find that the
plaintiff has waived or abandoned it by failing to defend it against the instant motion, which
challenges all claims in the case.    (Doc. 18, Doc. 21 at 5-6; Doc. 12).

The defendant seeks summary judgment on the ground that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on all the plaintiff's claims. (Doc. 12). The plaintiff opposes the motion with respect to her pregnancy discrimination claims, but does not oppose it with respect to her state law claims. (Doc. 18).

For the reasons set forth below, the court finds that the defendant's motion for summary judgment is due to be denied with respect to the plaintiff's pregnancy discrimination claim and granted with respect to her remaining claims.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   FACTUAL BACKGROUND[3]

On March 17, 1998, the defendant hired the plaintiff to fill the position of cash services administrative clerk ("administrative clerk"). (Pl. Affidavit at ¶ 1).[4] The defendant scheduled the plaintiff to work from 9:00 a.m. until 5:30 p.m., with two paid fifteen-minute breaks and an unpaid thirty-minute lunch break. (*Id.* at ¶ 2; Fullerton Affidavit at ¶ 13).[5]

---

[3]Excluded from this discussion are facts set forth in the "Supplemental Evidentiary Submission to Federal Reserve Bank of Atlanta's Motion for Summary Judgment," which the defendant filed with its reply brief. (Doc. 19). The court declines to consider that additional evidence rather than give the plaintiff an opportunity to respond to it. The plaintiff must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990) (citing, *inter alia*, *Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2d Cir. 1980) ("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")). When faced with additional evidence submitted by the moving party after the time set for the non-moving party to file all her evidence in opposition to the motion, the court has two options: "it [can] strike the [evidence] or grant plaintiff as the nonmoving party the opportunity to respond to it." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998), *cert. denied*, 525 U.S. 1054, 119 S. Ct. 617, 142 L. Ed. 2d 556 (1998), ("Having accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief."). The court notes, however, that its decision would not likely have been affected by any of this additional evidence.

[4]The plaintiff's affidavit is located in the record at Doc. 18, Ex. A.

[5]Fullerton's affidavit is located in the record at Doc.12, Ex. 1.

The plaintiff's job duties included balancing the day's work for three handling units -- paying, receiving, and high-speed processing. (Fullerton Affidavit at ¶¶ 8-9). The defendant scheduled all units to be closed out by 4:30 p.m., which gave the plaintiff an hour to complete her balancing duties before the end of her scheduled work day. (*Id*. at ¶¶ 12-14). Absent any problems, the plaintiff would be able to finish her balancing duties by 5:30. (Strength Depo. at 85).[6] If there were any problems, the balancing could take longer than an hour, and the plaintiff would need to work overtime in order to finish her balancing duties before she left. (*Id*. at 85-86). When the plaintiff would be required to work past 5:30 p.m. was unpredictable. (*See* Strength Depo. at 66-68). Regardless of whether she had finished balancing, the plaintiff could not leave until her supervisor allowed her to do so. (Pl. Depo. at 163-65).[7]

A few weeks after the plaintiff started working for the defendant, Jerome Hill was assigned to be her supervisor. (Pl. Affidavit at ¶¶ 1, 3). Soon thereafter, in mid-April, 1998, the plaintiff notified the defendant that she was three months pregnant. (Pl. Affidavit at ¶ 3; Pl. Depo. at 190). She first told Fred Fullerton, Assistant Vice-President for Accounting and Human Resources, who told her to notify Steve Booth (who worked in the Human Resources Department) as well as Sandra Strength, the defendant's Director of Cash Services. (*Id*. at 190-92).[8] Fullerton and Strength instructed the plaintiff not to tell Hill

---

[6]Excerpts from the deposition of Sandra Strength appear in the record at Doc. 18, Ex. C and at Doc. 12, Ex. 5.

[7]Excerpts of the plaintiff's deposition appear in the record at Doc 18, Ex. F. and at Doc. 12, Ex. 2.

[8]As a member of the defendant's personnel committee, Fullerton was a decisionmaker. (Fullerton Depo. at 27-28). According to him, Strength made the

she was pregnant. (*Id*. at 192-93, 198).  Even though the plaintiff did not then tell Hill she was pregnant, her working relationship with him changed after she had notified others in management of her pregnancy.  (Pl. Affidavit at ¶ 3; Pl. Depo. at 306-14).  The plaintiff claims that Hill began yelling at her and was "hateful" to her, which caused her to cry, her nose to bleed, and her chest to hurt.  (Pl. Depo. at 314-18).

After the plaintiff informed the defendant that she was pregnant, Hill changed her work conditions, duties and responsibilities.  Although the record is not entirely clear, it appears Hill made at least some of these changes before he allegedly became aware of the plaintiff's pregnancy on May 21, 1998.[9]  Soon after he became her supervisor, Hill began requiring the plaintiff to "clear" the printer every fifteen minutes, which required her to bend, stoop and lift.  (Pl. Affidavit at ¶ 6; Pl. Depo. at 128).  This constant bending and lifting caused the plaintiff back and hip pain and aggravated her sciatica.  (*Id*.).  Hill refused to reassign this task even when plaintiff told him that it was causing her pregnancy-related pain.  (*Id*.).

Soon after he became her supervisor, Hill also began requiring the plaintiff to get his permission to go to the bathroom.  (Pl. Affidavit at ¶ 7).  She sometimes had to wait for extended periods while she attempted to contact Hill on his pager in order to get

---

recommendation upon which the decisionmaking committee based its decision to terminate the plaintiff.  (*Id*. at 28).

[9]On May 21, 1998, after complaining to Hill about his treatment of her, the plaintiff met with Hill and Strength to discuss some of the problems she was having with Hill.  (Pl. Depo. at 167-68, 170-72).  At this meeting, Hill learned of the plaintiff's pregnancy.  (Doc. 21 at 6, & n.3 (citing Pl. Depo. at 187-89, Hill Depo. at 154)).

permission.  (*Id.*).  He did not lift this condition, even when the plaintiff told him that it was causing her physical and emotional discomfort related to her pregnancy.  (*Id.*).

Hill also began preventing the plaintiff from taking her breaks or going to lunch on time.  Moreover, she could not leave work in the evening until he dismissed her, even if she had completed her regular duties. (Pl. Depo. at 163-65; Pl. Affidavit at ¶ 5).  He did not attempt to alleviate these conditions even when the plaintiff told him that it was causing her physical and emotional discomfort related to her pregnancy.  (Pl. Affidavit at ¶ 5).

Hill also began requiring the plaintiff to work more overtime on a consistent basis, often when she had completed her regular duties.  (Pl. Depo. at 162, 326-27).  Yet when Hill was on vacation for two weeks, the plaintiff was not required to work overtime, and her interim supervisor found that certain duties that Hill had been demanding she perform on overtime, such as filing, were non-urgent and unworthy of overtime.  (Pl. Depo. at 326-28).

Hill also made the plaintiff uncomfortable by making several pregnancy-related remarks that she found to be inappropriate.  He also told her that his feelings were hurt because she had not told him she was pregnant.  (Pl. Depo. at 187-88).  He told her it was better that she was a single parent, since she did not have to deal with any "sorry suckers," apparently referring to the plaintiff's potential mates.  (Pl. Depo. at 188).

On May 21, 1998, after she had complained to Hill about his treatment of her, the plaintiff met with Hill and Strength to discuss a number of these issues. (Pl. Depo. at  167-68, 170-72).  She said that her interaction with Hill had caused her distress, that her workload was too heavy, that Hill had been depriving her of breaks, that he caused her to be late for lunch, that she was being pushed unnecessarily to complete filing that had been left undone for several years before she started and that she had to call someone in order

to use the bathroom.  (Pl. Depo. at 168-70).  There is no evidence that Strength or any other of the plaintiff's superiors substantively addressed any of her concerns, except that Strength set a deadline for completing the filing, to which the plaintiff agreed, and Hill stopped shouting at her.  (*Id*. at 173, 313).

The long days and the constant bending and lifting associated with clearing the printer eventually caused the plaintiff to suffer complications with her pregnancy.  On June 26, 1998, Brian E. Cressman, M.D., the plaintiff's physician, sent a letter to Strength, which stated:

> Michele is unable to perform her duties for longer than 8 hours and, as a matter of fact right now, due to the complications of her pregnancy, would do better for half days for the new two weeks until she can recuperate fully. After her two weeks of half days, I think she will be okay to work 8-hour shifts but probably is not capable of working longer than that due to her pregnancy.

(Pl. Depo. at Ex. 10).

Attached to Dr. Cressman's letter were some notes to him from the plaintiff, which stated, "My job is not supposed to be a job with bending or lifting but this past month (which is when/why it [the plaintiff's back and hip] started hurting in the first place), it was requested that I clear a printer (which prints out to the floor) every fifteen minutes." (*Id*. at Ex. 11).  She further states in these notes as follows:

> Over the past couple of months, overtime has become a major issue.  I didn't feel too bad after working 8 hours but when it rolled into 9 and 10 hours (after having my last meal 5 and 6 hours prior), I began to physically (and emotionally) feel bad.  These type of hours are no longer the exception, they have become the norm.
>
> Yesterday, after working until 7:00 p.m. nightly for almost two weeks . . . I met with my manager and told him that the hours and the clearing of the printer were not going to work for me any longer.  I could not continue to work more than 8 hours/day nor could I take any more steroids for my back so

there needed to be some changes made regarding the printer and some work prioritizations made of what needed to be done in 8 hours.

*Id.*

Faced with the plaintiff's medical restriction to work half a day for two weeks, Strength decided that the plaintiff's job duties could not be split; therefore, the defendant gave the plaintiff leave without pay for two weeks. (Strength Depo at 94-95). On July 8, near the end of the two-week period, Dr. Cressman sent another letter to Strength. This letter stated:

> Michele Daniel last saw me on 7/6/98. She is doing much better in regards to her hip and back pain now that she had been off her feet. I have released her for ½ days (4 hrs) for this week (performing usual activities). I hope that she can return to 8 hr days in 1-2 weeks. . . . Repetitive bending to the floor or lower than knee height should be avoided.

*Id.* Exh. 12.

The next day, Fullerton and Ben Peake, the defendant's Human Resources Section Manager, met with the plaintiff and told her that, if she was medically restricted from working more than eight hours a day, she would be terminated.[10] (Pl. Depo at 253-55). The plaintiff specifically requested that she be considered for extended leave without pay

---

[10]The plaintiff points out that her medical restriction to no more than 8 hours of work daily actually permitted her to work a half hour of overtime a week. (Pl. Affidavit at ¶¶ 2, 12). Since her day lasted from 9:00 a.m. to 5:30 p.m., with two thirty-minute breaks and a half-hour lunch break, she states that her regular workday consisted of 7.5 work hours, leaving her a half-hour each day to work overtime. (*Id.*). The defendant rejects this interpretation of the facts, stating that the plaintiff never before raised the possibility that she could work 30 minutes overtime per day under her restriction. Although the court must construe the facts in a light most favorable to the plaintiff, it must also consider the plaintiff's testimony that Hill deprived her of her scheduled breaks. (Pl. Affidavit at ¶ 5). Thus, the plaintiff testified, in essence, that she was already working thirty minutes of overtime on most days before she was terminated, so she would not have been able to work past 5:30 by taking non-existent breaks into account.

in order to keep her benefits, including health insurance, reminding Fullerton that he had once mentioned such an option to her. (Pl. Depo. at 254-55). When Fullerton summarily refused to consider her request, the plaintiff asked for time to speak with her doctor to see whether he would release her to work more than eight hours per day. (*Id.* at 255).

On Monday July 13, the plaintiff went to see Fullerton early in the morning before work began, and she told him that her doctor would not release her to work more than eight hours a day. (Pl. Depo. at 259-61). Fullerton asked the plaintiff to resign, and, when she refused, he terminated her and escorted her from the building. (*Id.*). The plaintiff's termination was effective after the close of business on July 10, 1998 -- the last day of her two-week leave. (*Id.* at 265). The reason stated for her termination was that she was "[u]nable to perform duties due to medical restrictions." (Doc. 18, Exh. L).

Hill testified that the defendant's practice and policy was to do everything in its power to accommodate employees with medical problems.[11] (Hill Depo. at 140-41). He stated that he has made accommodations for non-pregnant employees with medical restrictions, but not for pregnant employees with medical restrictions. (*Id.* at 139-42). Despite this policy of accommodation, the only arguable effort the defendant took to accommodate the plaintiff was a discussion between Strength and the decisionmakers as to whether there was anyone available to swap jobs with the plaintiff. (Strength Depo. at 173-75). They decided that this would not be feasible because the plaintiff had not been trained for any position but her own. (*Id.* at 174-75). No one consulted the plaintiff's immediate supervisor

_____

[11]Fullerton could not name any employee, other than the plaintiff, who was fired due to a medical restriction or an inability to work more than eight hours a day. (Fullerton Depo. at 57-58).

about any accommodation that might be possible. (Hill Depo. at 227-28). There is no record evidence that anyone ever acted to change some of the plaintiff's job duties, even the requirement that she clear the printer, although the defendant had been notified that this was causing the plaintiff to suffer medical difficulties. (Pl. Depo. at Exs. 10-11). The record reflects that Strength knew about several of the plaintiff's pregnancy-related job difficulties as early as the May 21, 1998 meeting she had with Hill and the plaintiff, but she did little or nothing in response to her complaints. (Pl. Depo. at 168-70).

## IV.   DISCUSSION

### A.   PREGNANCY DISCRIMINATION ACT

The plaintiff claims that the defendant terminated her in violation of the Pregnancy Discrimination Act ("PDA"), which provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. . . .

42 U.S.C. § 2000e(k).

In this circuit, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000). "In proving [a sex] discrimination claim, a plaintiff can establish a prima facie case of discrimination through either direct evidence of discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) for circumstantial

evidence." *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999), *cert. denied*, — U.S. —, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000), (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)).

In this case, the plaintiff contends that she has presented sufficient direct and circumstantial evidence to demonstrate a disputed issue of material fact with respect to her pregnancy discrimination claim. She therefore argues that the court is required to deny the motion for summary judgment.

### A.   DIRECT EVIDENCE

The plaintiff contends that she has presented substantial direct evidence of pregnancy discrimination to withstand the defendant's motion for summary judgment. She contends that the following facts are direct evidence of discrimination:

1. The plaintiff's supervisor "specifically altered her work environment in numerous ways that would specifically affect a pregnant woman," including:

   a. assigning her the task of clearing the printer every fifteen minutes, which caused her physical problems due to the bending and lifting required to complete the task;

   b. changing her schedule so that she missed or was late leaving for her morning and lunch breaks;

   c. requiring the plaintiff to get his permission before going to the bathroom;

   d. requiring the plaintiff to get his permission before leaving for the day, even if her work was completed; and

   e. requiring the plaintiff to work excessive overtime;

2.     The plaintiff's supervisor "made numerous statements that were directly related to [the plaintiff's] pregnancy and how it affected her job performance," including:

    a.     required her to clear her evening prenatal class schedule with him in advance;

    b.     told her his "feelings were hurt that she had not told him earlier about her pregnancy;"

    c.     yelled at her;

    d.     told her she was overly sensitive because she was pregnant; and

3.     The timing of her termination, i.e., she was terminated before she had an opportunity to discuss the overtime limitation with her doctor.

(Doc. 18 at 6, 15-18, 21-22).

Direct evidence is "evidence from which a trier of fact could reasonably find that the defendant more probably than not discriminated against the plaintiff on the basis of a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 (11th Cir. 1999). Accordingly, with the exception of the timing of her termination, the facts upon which the plaintiff relies were the acts of her supervisor, who was not the decisionmaker. In order for the evidence of these facts to be considered "direct evidence," the evidence must show that the *decisionmaker*, not her supervisor, discriminated against the plaintiff on the basis of pregnancy. *See Id*. at 1304, n.20; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989)("statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence of discrimination). The plaintiff's evidence of Hill's actions is not direct evidence because Hill did not make the decision to terminate her.

The plaintiff also contends that the timing of the decision to terminate her is direct evidence that the decision was based on her pregnancy.  On July 13, 1998, the defendant documented the fact that the plaintiff had been terminated *effective* at the close of business on July 10, 1998, the last day of the plaintiff's leave.  The fact that the plaintiff was terminated *effective* at the close of business on the last day of her leave does not indicate that the final decision to terminate her was made on that date (before the defendant was aware that the plaintiff's doctor would not lift the restriction), much less that she was terminated because she was pregnant.  It is not the sort of evidence from which a trier of fact could reasonably find that the defendant more probably than not discriminated against the plaintiff on the basis of her pregnancy.  *See Wright*, 187 F.3d at 1300.  Thus, the fact that the defendant terminated the plaintiff effective July 10th is not direct evidence of discrimination.

## B.   CIRCUMSTANTIAL EVIDENCE

Plaintiff contends that she can establish a case of pregnancy discrimination through circumstantial evidence.  The circumstantial evidence standards are well established:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

*Reeves v. Sanderson Plumbing Products, Inc.*, ___ U.S. ___, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105, 116-17 (2000) (internal citations and quotations omitted).

The defendant contends that the plaintiff cannot establish a prima facie case of pregnancy and that she cannot show that its articulated reason for her discharge is a pretext for discrimination.

### 1.    Prima Facie Case

The defendant contends that it is entitled to summary judgment because the plaintiff cannot establish a prima facie case of discrimination with regard to her termination. Generally, to demonstrate a prima facie case of discrimination with regard to termination, plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [non-pregnant] employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The plaintiff meets the first and second factors–she was a pregnant woman who was terminated. The defendant contends, however, that the plaintiff cannot show that she was qualified for her position or that non-pregnant employees were treated more favorably.

### a.    "Qualified to do the job"

The defendant contends that the plaintiff was not "qualified to do the job" because, although her position required her to work overtime,  she was medically restricted from working over eight hours a day.  This argument is inconsistent with Eleventh Circuit authority on this issue, which states as follows:

> Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification.  We have explained that the reason for this modification of *McDonnell Douglas* is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.

*Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999) (internal quotations and citations omitted), *cert. denied*, — U.S. —, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983), ("[I]n discharge and demotion cases, where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred.  However, where the position sought has not been held previously [such as in failure to promote and failure to hire cases] there is no basis for an inference of qualifications.")(emphasis added).

The plaintiff held the administrative clerk position for nearly four months, during which the defendant had no complaints about her performance.  (*See* Fullerton Depo. at 58, 104; Hill Depo. at 196-97).  She was apparently able to meet the defendant's standards, regardless of her pregnancy and of the burdensome work conditions imposed upon her after she became pregnant.  Fullerton expressly testified that the plaintiff was not

terminated for any sort of performance issue. (Fullerton at 58, 104). The plaintiff worked as administrative clerk for months without any indication that she was not qualified for her position or that she was not adequately performing the duties of the position. The court finds that she has met her burden of proving this aspect of the prima facie case. The issue of whether or not she was "disqualified" because of the medical restriction is thus reserved for the court's "evaluat[ion of] the pretextual nature of [defendant's] proffered nondiscriminatory reasons for [plaintiff's] termination." *Damon*, 196 F.3d at 1360.

### b. Similarly-situated employees.

The defendant contends that the plaintiff cannot establish a prima facie case of discrimination because she cannot "point to instances where [defendant] has made exceptions to its policies [requiring all employees to work overtime as necessary] for other similarly situated employees." (Doc. 21 at 15). For non-pregnant employees with work restrictions, however, the plaintiff's supervisor testified that he had done "everything in his power" to accommodate such employees in accordance with the defendant's policies; he also stated that defendant's policy is to work with employees with "a doctor's excuse or something of that nature." (Doc. 18, Exh. D at 140-41). On the other hand, he stated that he had never accommodated any pregnant employee. (*Id*. at 141).

"A plaintiff alleging pregnancy discrimination need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating her." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000)(citing *Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1383 (11th Cir. 1994)). The plaintiff has presented evidence that the defendant had a policy of trying to accommodate employees with medical work restrictions and that no such attempt was made to accommodate her work restriction

or even to eliminate the job task that caused her back and hip problems. (Hill. Depo. at 139-142). The court finds that this evidence is sufficient to show that the defendant treated similarly situated employees more favorably so as to satisfy this element of her prima facie case.

Thus, the court finds that the plaintiff has presented sufficient evidence of a prima facie case of pregnancy discrimination to withstand the defendant's motion for summary judgment.

### 2.    Pretext

#### a.    Legitimate, Nondiscriminatory Reason

The plaintiff has established a prima facie case under *McDonnell Douglas*, so the burden shifts to the defendant to produce evidence showing that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Reeves*, 120 S. Ct. at 2106. The Supreme Court outlined this phase of the analysis as follows:

> Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.*; *see also St. Mary's Honor Center*, [509 U.S. 502,] 507-508 (1993). That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, *supra*, at 256.

*Reeves*, 120 S. Ct. at 2106.

The defendant contends that it terminated the plaintiff because she could not work overtime. It argues that each one of its employees must be available to work overtime,

without exception.  The evidence shows that Fullerton and Peake informed the plaintiff that she would be terminated if she was medically restricted to working only eight hours per day. After checking with her doctor, the plaintiff told Fullerton on Monday July 13, 1998, that she was medically restricted to working only eight hours a day.  She was terminated effective Friday, July 10, 1998.  This evidence is consistent with defendant's articulated reason for plaintiff's discharge – that she was medically restricted from working more than eight hours per day.    The  defendant  has  thus  met  its  burden  of  proffering  a  legitimate, nondiscriminatory reason for the adverse employment action.

### b.    Challenge to the Proffered Legitimate, Nondiscriminatory Reason

The defendant alleges that it terminated the plaintiff because she was unable to perform her duties due to her medical restriction.  (*See* Fullerton Depo. at 104)("[the plaintiff] was fired because she was not able to do her job.").  The defendant states that each one of its employees must be available to work overtime, that the plaintiff had to work overtime to perform her duties and that, although its policy was to try to accommodate employees with medical restrictions, it could not feasibly accommodate the plaintiff's restriction.[12]

The plaintiff contends that the proffered legitimate, nondiscriminatory explanation is a pretext for discrimination.  In discussing the burden that must be met by the plaintiff to show pretext, the Eleventh Circuit stated as follows:

> When deciding a motion by the defendant for judgment as a matter of law in
> a discrimination case in which the defendant has proffered nondiscriminatory

---

[12]Although the defendant raises some of these assertions in its prima facie case analysis, it relies on them implicitly, if not expressly, to circumvent the plaintiff's pretext arguments as well.

reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d [1061,] 1072 [*cert denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L. Ed. 2d 1031 (1997),] (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d [1548,] 1564 [(1995)] (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In attempting to meet the *Combs* standard, the plaintiff offers several items of evidence that allegedly show that the proffered reason is unworthy of credence. The plaintiff argues that the actual amount of overtime required for her to perform her duty was neither so extensive that it could not fit within her medical restriction nor as immutable as the defendant represents. She states that, during her job interview, Strength and Peake told her that overtime would rarely be required, and that Strength told her that overtime would be required "once a month," at most. (Pl. Depo. at 54-56, 59-60). She argues that her overtime work increased primarily due to Hill's caprice, and not because of urgent balancing duties that needed to be performed. As evidence, she states that she worked very little overtime before Hill became her supervisor, and none during Hill's two-week

vacation, when her interim supervisor deemed the tasks Hill customarily required her to perform on overtime to be non-urgent and unworthy of overtime. (Pl. Depo. at 326-28).[13] This evidence calls into question whether the plaintiff's ability to work overtime was actually as vital to her position as the defendant contends and whether her medical restriction actually prevented her from performing her job. This evidence casts doubt on the defendant's proffered legitimate nondiscriminatory reason.

The plaintiff also presents evidence that the defendant had a flexible scheduling policy in its personnel manual that could have been used to allow her to perform all the crucial balancing activities within her medical restriction. She points to several of the defendant's policies that provide for the possibility of flexible scheduling or work arrangements for employees.[14]   (Doc. 18, Ex. E). These policies were featured in the defendant's personnel manual and were dated January 1, 1998, a number of months before the plaintiff was terminated. (Id.). Although Fullerton averred that these policies "were not options that we were currently using within the bank," (Fullerton Depo. at 85-86),[15] the plaintiff argues that, had they been considered, such policies could have been used to permit her to start and end work later in the day, allowing her to stay late past 5:30 for urgent balancing activities that arose from time to time. If balancing took only the

---

[13]Strength, who had instructed the plaintiff not to tell Hill of her pregnancy, heard at least some of the plaintiff's grievances about Hill's assignments and demands at the May 21, 1998 meeting she had with Hill and the plaintiff.

[14]The court notes that the medical restriction was temporary, as the plaintiff was in or near her third trimester of pregnancy, so any potential scheduling accommodation would have ended within a few months.

[15]Fullerton does not explain why the defendant adopted such policies in writing but disregarded them in practice.

scheduled hour, she could continue attending to non-urgent duties until the end of her revised workday. The evidence reflects that, in spite of its policy of trying to accommodate employees with a medical restriction, the defendant did not consider how such a policy might be used to allow the plaintiff to perform her duties without having to violate her doctor's orders.[16] This incongruity between the defendant's stated policy to try to accommodate employees with medical restrictions and its disregard for or failure to consider a written policy that could have provided for such an accommodation casts doubt upon the defendant's proffered legitimate, nondiscriminatory reason, and the rationales offered in support thereof.

The plaintiff also presents evidence that a number of other employees could perform her end-of-the-day balancing activities, so that accommodation of her medical restriction would have been feasible, contrary to the defendant's assertions. (*See* Hill Depo. at 223-27). The defendant argues that none of the people cited by the plaintiff could assist her with overtime duties because of one of several reasons: (1) some held valuables during the day and thus could not act as an "independent" balancer, (2) some ended their workday earlier than the plaintiff, which meant they would be unable to stay to help her, and (3) some were classified as "management," so that the defendant would have been required to use extra controls, including extra paperwork, in order for any manager to help her. (*See* Affidavit of Fullerton at ¶¶ 21-26). The court notes, however, that Fullerton, a

_____

[16]The defendant was not required to give the plaintiff a flexible schedule, but its utter failure to even consider such an accommodation (which was included among its written policies) or any other possible accommodation (other than the rejected "job switch" option, discussed below), when its policy is to try to accommodate those with medical restrictions, calls into question its professed reason for firing the plaintiff.

decisionmaker, never made any inquiry as to whether there were employees outside the valuable-holding area who could have assisted the plaintiff. (Fullerton Depo. at 47). Also, during the two weeks of medical leave the defendant required the plaintiff to take before her termination, another employee performed her duties, and that employee's department was able to function without her or any other substitute employee. (Strength Depo. at 99). Hill also stated that there were two employees that he would call upon to do the plaintiff's balancing duties if she had to leave early for some reason. (Hill Depo. at 219-20). The evidence is also that the managers could help the plaintiff, albeit with the necessary extra controls, in "extreme circumstances," although there is no explanation of that term, or whether it would exclude the temporary medical restriction of an employee in good standing. (Fullerton Affidavit at ¶ 24). Although the defendant was not required to assign other employees to help the plaintiff with her overtime duties, its failure to consider such an option, when its policy is to try to accommodate those with medical restrictions, casts doubt upon the proffered legitimate nondiscriminatory reason.

Furthermore, the plaintiff presents evidence that the defendant has a policy for allowing employees with less than 12 months of service to obtain more than 10 days of leave without pay if they can prove "great hardship." (Fullerton Depo. at 73-75). Before she was terminated, the plaintiff specifically requested that Fullerton consider her for extended leave without pay, so she could retain her medical benefits. (Pl. Depo. at 254-55). Fullerton merely replied that the defendant did not have a slot for her. (*Id.*). He made no effort to determine if the plaintiff, a single woman in late pregnancy, facing unemployment and the possible loss of health benefits, would have met the definition of "great hardship" under this policy, nor did he allow her an opportunity to demonstrate that

she could meet this definition. (Fullerton Depo. at 73-75; Pl. Affidavit at § 11). The evidence thus reflects that this option was not even considered in the plaintiff's case. Although the defendant was not required to grant the plaintiff such leave, its failure to even consider her request for it, in view of the other evidence offered by the plaintiff, calls into question its proffered legitimate reason.[17]

The court further notes that the defendant offered evidence that it considered a possible accommodation for the plaintiff, in which she could have switched positions with another employee named Michelle Fitzgerald. (Strength Depo. at 174-75). The defendant rejected this option *not* because Fitzgerald's job also required overtime, but because the plaintiff did not know how to perform Fitzgerald's job. (*Id.*). This evidence appears to be inconsistent with the defendant's emphatic contention, offered in support of its proffered legitimate reason, that every single one of its employees, no matter what rank or function, must be able to work overtime. (Fullerton Depo. at 52-54). If this were actually the case, it seems that the defendant would not have bothered considering the plaintiff for any other position once it had learned of her restriction.

The evidence presented by the plaintiff as a whole demonstrates enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

---

[17]The defendant argues that it is not required to give the plaintiff special treatment on account of her pregnancy, (Doc. 20 at 5, citing *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1317 (11th Cir. 1994), ("the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees.")). The court's analysis is consistent with *Armstrong*. The defendant was not required to grant the plaintiff any specific alternative or option, but its failure to even consider doing so, when its policy is to try to accommodate employees with medical restrictions and when it has accommodated non-pregnant employees, merely serves as evidence casting doubt on its proffered legitimate reason, and the arguments offered in support thereof.

employer's proffered legitimate reasons that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d at 1072. A reasonable factfinder could conclude that the defendant is exaggerating the importance of the overtime requirement, both with respect to the plaintiff and to its work force in general. A reasonable factfinder could conclude that the defendant, which has a policy of trying to accommodate employees with medical restrictions, is exaggerating the difficulty that it would encounter in accommodating the plaintiff's medical restriction. A reasonable factfinder could conclude that the defendant violated its own policy of accommodation by failing to even consider the available options to terminating the plaintiff, whereas it has followed the policy of accommodation for non-pregnant employees with medical restrictions . In sum, the court finds that a reasonable factfinder could look at all the evidence offered by the plaintiff and conclude that it is "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528. Thus, under *McDonnell Douglas*, the plaintiff is entitled to present this claim to a jury. The motion for summary judgment as to this claim is due to be denied.

### B.    STATE LAW CLAIMS

The defendant contends that it is entitled to summary judgment on the plaintiff's state law claims.   The plaintiff has presented no opposition to defendant's motion for judgment on these claims, so the defendant's motion for summary judgment is due to be granted in this regard.

### IV.    CONCLUSION

For the reasons set forth above, the court finds that defendant's Motion for Summary Judgment (Doc. 12) is due to be denied as to the plaintiff's pregnancy discrimination claims, and granted as to all other claims.  The court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

**DONE** this _____ 31ˢᵗ _____ day of January, 2001.


_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge